UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| MICHAEL ANDREW PARIS,<br>　　　　　　　　　　Plaintiff,<br><br>v.<br><br>GEORGE A. NEOTTI et al.,<br>　　　　　　　　　　Defendants. | Case No.: 10cv1586 JLS (JLB)<br><br>**REPORT AND RECOMMENDATION DENYING FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[ECF No. 13]** |
|---|---|

## I. INTRODUCTION

Michael Andrew Paris ("Petitioner"), a California state prisoner, is proceeding with a Writ of Habeas Corpus pursuant to 28 U.S.C. §2254. In 2007, a San Diego Superior Court Jury convicted Petitioner of murder, assault with a semiautomatic firearm, and permitting another to discharge a firearm from a vehicle (with gang enhancements on each count). (*See* ECF No. 1-1 at 1-2.) Petitioner asserts that his incarceration is unlawful because the prosecutor violated Petitioner's Fifth Amendment right against self incrimination by improperly commenting on his silence during closing argument. (ECF No. 13 at 3.)[1]  After reviewing the relevant material lodged with the Court and for the reasons set forth below, the undersigned **RECOMMENDS** that the Petition be **DENIED**.

---

[1] Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the Court's electronic case filing system.

1

## II. PROCEDURAL HISTORY

On January 19, 2007, a jury convicted Petitioner of: (1) murder pursuant to Cal. Penal Code §187(a); (2) assault with a semiautomatic firearm pursuant to Cal. Penal Code §245(b); and (3) permitting another to discharge a firearm from a vehicle pursuant to Cal. Penal Code (3) §12034(b). (ECF No. 7-10 at 1-2.) "The jury found true allegations that in the course of committing murder, [Petitioner] personally and intentionally discharged a firearm and proximately caused great bodily injury and death (Cal. Penal Code §12022.53(d)), and that he committed all of the offenses for the benefit and at the direction of a criminal street gang within the meaning of section 186.22, subdivision (b)(1)." (*Id.* at 2.) The jury acquitted Petitioner of the attempted murder charge. (*Id.*)

After his conviction, Petitioner dismissed his trial counsel. (ECF No. 13-1 at 2.) He retained new counsel to assist him in filing a motion for new trial based on ineffective assistance of trial counsel, prosecutorial misconduct, and various other grounds. (*Id.*)

The trial court denied Petitioner's motion for a new trial and sentenced him to an indeterminate term of 50 years to life for the murder plus a determinate term of 11 years for the assault charges. (*Id.* at 4.) Petitioner appealed his conviction to the California Court of Appeal. (*Id.*) In an unpublished decision, the Court of Appeal affirmed Petitioner's convictions. (*See* ECF No. 7-10.) Regarding Petitioner's Fifth Amendment claim, the court found no error under the application of *Griffin v. California*.[2]

Petitioner appealed the decision to the California Supreme Court. (ECF. No 13-1 at 4.) There, he raised two constitutional claims: (1) that he was denied his Sixth Amendment right to effective assistance of counsel; and (2) that he was "denied his Fifth Amendment right not to testify by the prosecutor's improper comment on his silence pursuant to *Griffin v. California*." (*Id.*) On November 10, 2009, the California Supreme Court denied the petition for review without a written opinion. (*Id.* at 5.)

---

[2] *Griffin v. California*, 380 U.S. 609, 615 (1965) (holding "[T]he Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt.").

2

On July 29, 2010, Petitioner filed his original Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. §2254, containing both his Fifth and Sixth Amendment claims. (ECF No. 1.) On January 7, 2013, the Petition was dismissed without prejudice. (ECF No. 12.) The Court found that Petitioner had properly exhausted his Fifth Amendment claim but that he had failed to exhaust his Sixth Amendment claims.[3] (*Id*. at 10-13.)

On February 20, 2013, Petitioner filed his First Amended Petition containing his exhausted Fifth Amendment claim. (ECF No. 13.) Petitioner also filed a Motion to Stay his First Amended Petition. (ECF No. 14.) On June 21, 2013, Petitioner filed his Second Amended Petition, reasserting his Fifth Amendment claim and his allegedly newly exhausted Sixth Amendment claims.[4] (ECF No. 16.) On July 3, 2013, the State ("Respondent") filed a Motion to Dismiss both the First and Second Amended Petitions, alleging that both Petitions were untimely. (ECF No. 17 at 2.) On September 20, 2013, the Court dismissed Petitioner's Second Amended Petition with prejudice and denied as moot his Motion to Stay regarding his First Amended Petition. (ECF No. 20.)

Petitioner appealed the decision to the United States Ninth Circuit Court of Appeals. (ECF No. 23.) On June 9, 2014, the Ninth Circuit Court found that the challenged court order did not dispose of all claims and that Petitioner's exhausted Fifth Amendment claim was still pending. (ECF No. 27.) On July 24, 2014, the Ninth Circuit granted Petitioner's Motion for Voluntary Dismissal of his appeal. (ECF No. 28.) On August 12, 2014, Respondent filed an Answer to Petitioner's Fifth Amendment claim. (ECF No. 32.)

---

[3] The district court found that Petitioner's original petition was a "mixed petition" containing both exhausted and non-exhausted claims. (ECF No. 12 at 10-12.) Specifically, the district court found that the Petitioner argued five separate "sub-claims" under the Sixth Amendment to the California Supreme Court that had not been specifically and separately pled at the state court appellate level. (*Id*. at 7.) The exhaustion of available state judicial remedies is a prerequisite to a federal court's consideration of claims presented in habeas corpus proceedings. 28 U.S.C. § 2254(b); *see Rose v. Lundy*, 455 U.S. 509, 521-22 (1982).

[4] Petitioner alleges that, by this time, the California Supreme Court had decided against him regarding his previously unexhausted Sixth Amendment Claims. (*See* ECF No. 16 at 5.)

This Report and Recommendation addresses Petitioner's pending Fifth Amendment claim as set out in his First Amended Petition. (ECF No. 13.)

## III. FACTUAL BACKGROUND

On January 19, 2007, Petitioner was convicted by a San Diego Superior Court jury of the 2004 murder of Jeremy Hogan, assault with a semiautomatic firearm, and permitting another to discharge a firearm from a vehicle. (ECF No. 7-10 at 1-2.) Petitioner was acquitted of the 2005 attempted murder of LaDonte Wilson. (*Id.* at 2.) The following factual summary is taken from the Court of Appeal decision affirming Petitioner's conviction:[5]

**A. The Murder of Jeremy Hogan**

> At about 7:34 p.m. on December 13, 2004, Jeremy Hogan was shot and killed in a drive-by shooting while he and his friend Alonzo Howell were in front of a house on Alvin Street. Alvin Street is in the neighborhood of Emerald Hills. About a dozen people were in front of the house at the time, including some members of the "Emerald Hills" street gang. Howell heard eight or nine shots and saw a black truck driving off. Deeone Lamar Manson was at the party and also heard the shots; she saw a black truck turning around a corner speeding away. Hogan died from a gunshot wound to his head.
>
> Two individuals who were in the black truck that day - Maurice Williams and Deondray Thomas - testified that [Petitioner] shot Hogan. Williams and Thomas both entered into agreements with the District Attorney's office. According to Williams, earlier that day, he, Thomas and [Petitioner] had decided to go to the beach to smoke marijuana. Williams and Thomas were childhood friends who lived on Cardiff Street in a "Skyline" gang neighborhood, and Williams had only met [Petitioner] a few months earlier through Thomas. Williams is a Skyline gang associate. Williams drove [Petitioner's] black truck with [Petitioner] in the front passenger seat and Thomas between them to Sunset Cliffs beach, where they smoked two "blunts" (marijuana cigars). On their way back, [Petitioner] told Williams to drive through Emerald Hills, where they ended up on Alvin Street. When he had traveled about five or six houses down, [Petitioner] stuck his upper body

---

[5] This Court gives deference to state court findings of fact and presumes them to be correct. 28 U.S.C. §2254(e)(1); *see also Sumner v. Mata*, 449 U.S. 539, 545-47 (1981) (stating that deference is owed to factual findings of both state trial and appellate courts).

out of the window, said, "Fuck Emerald Hills," and fired two shots with a gun. After [Petitioner] brought his body back into the car, Williams saw that he had a revolver. Williams, who was unarmed, had not known [Petitioner] or anyone else had a gun and there had been no discussion at the beach about doing any sort of shooting. Shocked, Williams initially slowed the truck down to about 10 or 15 miles per hour, but then sped up when [Petitioner] said, "Go, go, go." He turned right onto Imperial and got back on the freeway. The next morning, Williams read in the newspaper that a person had been killed on Alvin Street.

Thomas, a Skyline gang member who spent a lot of time with [Petitioner], related the same story about taking [Petitioner's] truck to the beach with [Petitioner] and Williams and returning via Emerald Hills. Before they left for the beach, [Petitioner] showed Thomas an old revolver that Thomas had never seen before. According to Thomas, before they turned onto Alvin Street, [Petitioner], who was in the passenger seat, removed the gun from his waistband, stuck the upper half of his body out of the window, and fired once or twice. Thomas did not hear [Petitioner] yell anything about Emerald before shooting. The next day, [Petitioner] told Thomas he had gotten a "K" (a "kill") and seemed happy about it, and [Petitioner] later bragged about it to others, including William Trice, who testified at trial that in January 2005 [Petitioner] told him he had "killed some guy from Emerald."

(ECF No. 7-10 at 3-4.)

**B. The Maurice Williams Shooting and Petitioner's Threats**

Days after Hogan's murder, Thomas, Thomas's brother, and [Petitioner] came to Williams's house and accused him of being a "snitch," resulting in an altercation in which Williams hit [Petitioner]. At about the same time, Thomas's brother and [Petitioner] tried to hide the weapon on the side of Williams's house.

A couple of months later, detectives came to Williams's house to talk to him about the [Hogan] murder. Williams did not want to cooperate because he feared getting in trouble with police and also with Skyline gang members. He spoke briefly with detectives outside where others driving by saw them.

In October 2005, Williams was sitting in his car when someone ran up, yelled, "Fuck you," and shot six rounds into his car, striking Williams twice in the arm. Williams later pleaded guilty to voluntary manslaughter under an agreement with the District Attorney's office. The day before he signed the agreement, he was in protective custody when someone pointed out that

>[Petitioner] was calling out to him from a different area. When he looked over, [Petitioner] made a talking motion with his right hand and then a slashing motion across his neck with his finger. Williams took that to be at threat because of his cooperation with authorities.

(*Id*. at 5.)

**C. The Drive-By Shooting of LaDonte Wilson's Residence**

>On July 10, 2005, LaDonte Wilson was standing with his father and brother outside his house on Federal Avenue when he was shot at by Thomas, who was a passenger in [Petitioner's] burgundy Cadillac. Earlier that evening, Thomas had left a party with [Petitioner], Lloyd Dawson and fellow Skyline gang member Bernard Clemons, after drinking and smoking marijuana. [Petitioner] drove his Cadillac with Thomas behind him in the rear passenger seat and Dawson in the front passenger seat. Both Thomas and Clemons were armed. The men drove for 20 to 30 minutes, eventually getting close to a neighborhood claimed by "Lincoln Park," an enemy gang. As they drove down Federal Boulevard, they approached a crowd and [Petitioner] said, "There is somebody out there . . . right over here to the left." Thomas pulled out his gun and fired five shots out the back window to "scare" the individuals. [Petitioner], laughing, picked up speed and left. Shortly afterwards, the men were detained by police.

(*Id*. at 5-6.)

**D. Petitioner's Recorded Conversation with William Trice**

On July 23, 2005, William Trice and Petitioner were placed in the back of a patrol car; the conversation that followed was recorded. (ECF 7-4 at 6.) At one point during the conversation, Petitioner stated that Deondray Thomas had "snitched on [him] about that shit about Emerald Hills." (*Id*. at 8.) Trice replied, "You going to jail?" (*Id*.) Petitioner responded, "Most likely." (*Id*.)

Later, [Petitioner] said to Trice, "They gonna get me, they gonna get me for a long-long time. If you snitch on me I'm done." (*Id*. at 11.) Petitioner expressed his concern that Deondray Thomas may have told the detectives about the fact that Petitioner was bragging about getting a "K." (*Id*. at 12.) "[Deondray] said Alonzo said it. He said that Alonzo said that-that I told 'em, that I bragged to him that I had K . . . That I was telling everybody, yeah I got a K . . . ." (*Id*.)

Towards the end of the conversation, Trice said, "I know Reece [Maurice Williams] is telling." (*Id*. at 17.) Petitioner remarked: "Yeah . . . I'm not even gonna tell him I know. I'm just gonna fuck him up. Nah we can't fuck with him right away 'cause they gonna, he's gonna snitch then." (*Id*.)

**E. Trial – Witness Testimony**

During Petitioner's trial, the prosecution called Deondray Thomas, Maurice Williams, William Trice, and LaDonte Wilson to testify for the prosecution's case-in-chief. (*See* ECF No. 7-13 at 19-20.) Additionally, LaDonte Wilson was permitted to testify about a prior incident involving himself and Petitioner:

> At trial, the court gave the jury a limiting instruction [footnote omitted] and permitted the prosecutor to present evidence of two prior uncharged incidents involving [Petitioner] occurring in September 2004. Specifically, Wilson testified that on September 12, 2004, he was waiting in a liquor store parking lot for his cousin to get off work when [Petitioner] pulled up in his black truck with his head hanging out the window, saying "You 'Lincoln' niggers are slipping" and "Skyline." [Petitioner] also said, "I could have shot you, shot you guys." Wilson responded, "I ain't from nowhere and ain't nobody from 'Lincoln' over here, so I ain't slipping," and then walked away, feeling it was unsafe to stay. Wilson understood [Petitioner's] comment to mean Wilson was not watching his back like he should be.
>
> The next night, Wilson was in the same parking lot when he heard multiple gunshots and was struck three times, in the right arm, right hip side, and left foot. Though Wilson never saw the assailant, at some point he told investigating detectives that [Petitioner] was involved since they had had a confrontation the previous night. According to Wilson, after the incident, [Petitioner] drove through his neighborhood multiple times in his truck, a red car and a blue truck, waving gang signs and yelling, "Skyline."

(ECF No. 7-10 at 6-7.)

**F. Trial – Prosecutor's Closing Argument**

During the defense's closing remarks, defense counsel mentioned to the jury that the prosecution witnesses, Deondray Thomas, Maurice Williams and William Trice, had cooperated with the District Attorney's office. (ECF No. 7-10 at 28.) In her rebuttal argument, the prosecutor stated:

7

> Deondray Thomas, Maurice Williams, and William Trice, yes, they all talked to the police, and I talked to you about that in my opening statement. They took the stand. They testified, and they answered questions, whether they were asked by the D.A., myself, or whether they were asked by defense counsel. And you had an opportunity to listen to them. They admitted they smoked weed. They admitted they're gang members. They admitted that they committed these crimes that they were involved in and they were convicted of it, and they came forward with all of that.

(*Id*. at 24, FN 8). Near the end of her rebuttal argument, the prosecutor delivered the following charge to the jury:

> In conclusion, you have to ask yourselves, if he [Petitioner] didn't commit this murder, explain those statements in the back seat of the patrol car. Just explain them. Why is he after Maurice Williams? Why is he threatening Maurice Williams? Why is he threatening Maurice Williams a week before trial here, December 22nd, two weeks before trial? Why? Why is he going like this (indicating)? [¶] LaDonte Wilson had been harassed by this defendant for approximately ten months, started on September [] 12th[,] 2004, when they had their first confrontation, and then it ended on July 10th, 2005 when he was with his brother and father and was shot at. [¶] You saw, [Wilson] didn't want to testify here. He hated being here, but he did it. And he is angry. He is angry that it had to happen, that he has to be careful and cautious when he is standing in front of his own home with his father and his brother. He has to watch his back for cars. Don't go to the corner store, get down, run. That is how he had to live his life, because this defendant chose to run around his neighborhood and look for trouble.

(*Id*. at 24.) Petitioner's trial counsel then moved for a mistrial and claimed that the prosecutor's comments violated the Petitioner's Fifth Amendment right to remain silent. (ECF No. 13-1 at 15.) The trial court denied Petitioner's motion for retrial and subsequently provided the jury with the following instruction:

> A defendant has an absolute constitutional right not to testify. He or she may rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt. Do not consider, for any reason at all, the fact that the defendant did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way.

(ECF No. 7-10 at 28-29.)

## IV. STANDARD OF REVIEW

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under the AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002).

The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id*. Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). A state court need not cite Supreme Court precedent when resolving a habeas

corpus claim. *See Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" the state court decision will not be "contrary to" clearly established federal law. *Id.*

Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72. More specifically, clearly established federal law refers to "the holdings as opposed to the dicta, of [the] decisions." *Howes v. Felds*, 132 S. Ct. 1181, 1187 (2012).

Federal courts cannot rely solely on their own precedent to grant habeas relief. *Lopez v. Smith*, 135 S. Ct. 1, 2 (2014) ("We have emphasized, time and again, that the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional principle is 'clearly established.'"). A circuit court cannot "refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced." *Id.* at 4.

Instead, where no decision of the Supreme Court "squarely addresses" an issue or provides a "categorical answer" to the question before the state court, §2254(d)(1) bars relief because the state's adjudication of the issue cannot be contrary to, or an unreasonable application of, Supreme Court law. *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam). In other words, an abstract rule that has not been clearly established by the Supreme Court cannot be used to grant a petitioner habeas relief. *See Lopez*, 135 S. Ct. at 4.

## V. DISCUSSION

In his sole remaining claim, Petitioner alleges that he was denied his Fifth Amendment right not to testify when the prosecutor improperly commented on his silence. (ECF No. 13-1 at 14.) First, Petitioner argues that the prosecutor improperly commented on Petitioner's silence by indirectly comparing his choice to remain silent with the witnesses' willingness to testify, namely William Trice, Deondray Thomas, Maurice

Williams, and LaDonte Wilson. (*Id.* at 17-18.) Second, prosecutor's concluding comment to the jury to "just explain" was an indirect challenge to him to "take the witness stand and explain" his verbal and non-verbal statements to William Trice, Deondray Thomas, and Maurice Williams. (*Id.* at 15-16.) Accordingly, Petitioner argues that the Court of Appeal's ruling - that the challenged comments did not rise to the level of *Griffin* error - "involved an unreasonable application of clearly established Federal Law." (ECF No. 13-1 at 15.) Petitioner primarily relies on the Supreme Court's decision in *Griffin v. California*, 380 U.S. 609 (1965). Respondent asserts the state court's determination of this claim was not contrary to, nor an unreasonable application of, clearly established federal law. (ECF No. 32 at 13.)

Petitioner raised this claim on direct appeal to the California Court of Appeal, and it was denied in an unpublished opinion. (ECF No. 7-10.) Petitioner then raised the issue in petition for review to the California Supreme Court, which denied the claim without comment. (ECF. No 13-1 at 5.) Accordingly, this Court must "look through" to the state appellate court's decision denying the claim as the basis for its opinion. *Ylst*, 501 U.S. at 805-06. The state appellate court denied the claim as follows:

> Here, the prosecutor's challenged remarks are plainly read as asking the *jurors* to reconcile *for themselves* ("In conclusion, you have to ask yourselves . . .") whether there was an innocent explanation for [Petitioner's] threat to Williams and comments to Trice in the patrol car, suggesting there was no such explanation for [Petitioner's] words and actions. We are not persuaded by [Petitioner's] attempts to characterize this comment as a challenge to him to "take the witness stand and 'explain' [his] verbal and non verbal statements he made to William Trice, Deondray Thomas and Maurice Williams." In reading the entirety of the remarks, the prosecutor in no way suggested that the jury should look to [Petitioner] for an explanation. Rather, in our view, this is the kind of fair comment on the state of the evidence (or the absence thereof) that occurred in *Sanders* [*People v. Sanders* (1995) 11 Cal.4th 475] rather than a suggestion that the prosecution's evidence was not, or should have been, personally contradicted by [Petitioner].
>
> To the extent [Petitioner] argues the prosecutor sought to compare his silence with the willingness of Thomas, Trice and Williams to testify akin to what

occurred in *People v. Guzman, supra*, 80 Cal.App.4th 1282, we likewise cannot agree.  Here, the prosecutor followed her comments about Thomas, Trice and Williams by telling the jury that [Petitioner] sought to discredit them due to their cooperation with the District Attorney's office.  The prosecutor acknowledged that they were not necessarily upstanding persons, and that the jury might disagree with the fact that they had severed ties with their families and received deals.  The comments were directed to the credibility of these witnesses, and not a comparison between those witnesses and [Petitioner] as done in *Guzman*.  (See *Guzman*, at pp. 1286-1290.) The prosecutor's comments about those witnesses and her request to jurors to explain [Petitioner's] statements for themselves is separated by 23 pages of transcript. It is not reasonably likely that the jury construed these widely separated comments regarding the main prosecution witnesses and [Petitioner] as a reflection on [Petitioner's] silence.

Assuming arguendo there was *Griffin* error, the error was harmless.  The jury was instructed as follows: "A defendant has an absolute constitutional right not to testify.  He or she may rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt.  Do not consider, for any reason at all, the fact that the defendant did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way."  (CALCRIM No. 355.)  "Jurors are presumed to understand and follow the court's instructions" (*People v. Holt* (1997) 15 Cal.4th 619, 662.)  [Petitioner] has not pointed to evidence or any matter in the record rebutting that "crucial assumption." (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.)  This, combined with the strong evidence of [Petitioner's] guilt, convinces us beyond a reasonable doubt that the jury would have convicted him of his offenses even if the prosecutor had refrained from making her challenged comments. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Hardy*, *supra*, 3 Cal.4th at p. 154.)

(ECF No. 7-10 at 27-29 (emphasis in original).)

**A. The Prosecutor's Statements Did Not Violate Clearly Established Federal Law**

In *Griffin*, the Court held that the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin*, 380 U.S. at 615.  The prosecutor's statements in the instant case did not directly call attention to Petitioner's decision not to testify at trial.  Petitioner nonetheless argues that the prosecutor's statements amount to "an implied reference to

petitioner's silence and failure to testify . . . ." (ECF No. 13-1 at 15.) "The prosecutor's argument gave the jury a license to consider in their deliberations petitioner's failure to 'just explain' his comments in the back seat of the patrol car to William Trice and his alleged threat to Maurice Williams not to testify prior to trial." (*Id.*) Petitioner argues that the Court in *Griffin* held that a "prosecutor cannot comment, directly or indirectly, on the defendant's failure to testify in his defense." (ECF No. 13-1 at 15.) This is an overbroad reading of *Griffin*.

The Supreme Court has explained that *Griffin* only "addressed prosecutorial comment[s] which baldly stated to the jury that the defendant must have known what the disputed facts were, but that he had refused to take the stand to deny or explain them." *United States v. Robinson*, 485 U.S. 25, 32 (1988). *Griffin* did not clearly establish that a defendant's Fifth Amendment rights are violated by prosecutorial comments that indirectly reference a defendant's failure to testify. *Id.*; *see also Melendez v. Grounds*, 2013 WL 1662355, at *12 (N.D. Cal. April 17, 2013).

The Ninth Circuit has recognized that while "a direct comment about the defendant's failure to testify always violates *Griffin*, a prosecutor's indirect comment violates *Griffin* only 'if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify.'" *Hovey v. Ayers*, 458 F.3d 892, 912 (9th Cir. 2006), (citing *Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987)).

In the instant case, the prosecutor stated the following in her rebuttal argument:

In conclusion, you have to ask yourselves, if he [Petitioner] didn't commit this murder, explain those statements in the back seat of the patrol car. Just explain them. Why is he after Maurice Williams? Why is he threatening Maurice Williams? Why is he threatening Maurice Williams a week before trial here, December 22nd, two weeks before trial? Why? Why is he going like this (indicating)? [¶] LaDonte Wilson had been harassed by this defendant for approximately ten months, started on September [] 12th[,] 2004, when they had their first confrontation, and then it ended on July 10th, 2005 when he was with his brother and father and was shot at. [¶] You saw, [Wilson] didn't want to testify here. He hated being here, but he did it. And he is angry. He

> is angry that it had to happen, that he has to be careful and cautious when he is standing in front of his own home with his father and his brother. He has to watch his back for cars. Don't go to the corner store, get down, run. That is how he had to live his life, because this defendant chose to run around his neighborhood and look for trouble.

(ECF No. 7-10 at 24.)  The state court found that the prosecutor was simply commenting on the state of the evidence.  (ECF No. 7-10 at 27-29.)   This Court agrees with the state court's conclusion that the prosecutor was asking the jury to *ask themselves* whether an innocent explanation exists for Petitioner's threat to Williams and comments to Trice in the patrol car.  The comment served to argue the implausibility of any scenario whereby Petitioner would threaten these witnesses for perceived cooperation, if Petitioner had not committed the murder.  Petitioner himself acknowledges that *Griffin* "does not extend to comments on the state of evidence or on the failure of the defense to introduce material evidence or to call logical witnesses."  (ECF No. 13-1 at 16.)  *See, e.g.*, *U.S. v. Lopez-Alvarez*, 970 F.2d 583, 595-96 (9th Cir. 1992) (a prosecutor may properly comment upon the defendant's failure to present exculpatory evidence so long as it is not phrased to call attention to defendant's failure to testify).

The above comment does not amount to a direct comment on Petitioner's failure to take the stand, nor was it is manifestly intended to call attention to the defendant's failure to testify, nor was it of such a character that the jury would naturally and necessarily take it to be a comment on Petitioner's failure to testify. *Hovey*, 458 F.3d at 912.

As to the second comment at issue, the prosecutor stated:

> Deondray Thomas, Maurice Williams, and William Trice, yes, they all talked to the police, and I talked to you about that in my opening statement.  They took the stand.  They testified, and they answered questions, whether they were asked by the D.A., myself, or whether they were asked by defense counsel.  And you had an opportunity to listen to them. They admitted they smoked weed. They admitted they're gang members. They admitted that they committed these crimes that they were involved in and they were convicted of it, and they came forward with all of that.

//

(ECF No. 7-10 at 24, FN 8; *see also* ECF No. 7-25 at 42.)  Petitioner alleges that this comment indirectly compared his choice to remain silent with the witnesses' willingness to testify. (ECF No. 13-1 at 15.)  The state court found that this comment was aimed at the credibility of the prosecution's witnesses.  (ECF No. 7-10 at 27-29.)  "[T]he prosecutor followed her comments about Thomas, Trice and Williams by telling the jury that [Petitioner] sought to discredit them due to their cooperation with the District Attorney's office." (*Id.*; *see also* ECF No. 7-25 at 42.)

The state court reasonably concluded that no *Griffin* error occurred.  The prosecutor's statement during rebuttal argument was not a direct attack on petitioner's failure to testify.  Nor did the comment indirectly attack, or call attention to, petitioner's failure to testify. The comment was made in rebuttal to defense counsel's argument that the testimony offered by the prosecution's three main witnesses was not credible.  (ECF No. 7-25 at 5.)  "[S]ome of the pivotal testimony consisted of the testimony of three witnesses, Mr. Trice, Mr. Williams, and Mr. Thomas, all of whom had much in common, and their commonality is what I think individually and collectively makes them unbelievable . . . ." (*Id.*)  Defense counsel concluded his closing argument with the following statement: "I urge you to do the right thing, and I urge you to find Mr. Paris not guilty, and reject the testimony of Mr. Trice, Williams, and Thomas, and find him not guilty." (*Id.* at 38.)

Considered in this context, there is no reason to believe that the jury would have interpreted the prosecutor's statement as a comment on Petitioner's failure to testify. Instead, the jury likely would have understood the prosecutor to be pointing out the aspects and circumstances of the witnesses' testimony that the jury could appropriately use to assess their credibility.  In fact, the prosecutor specifically stated, "These are all things that you can look at in determining whether or not you believe the witness." (ECF No. 7-25 at 43.)  The comment was not of "such a character that the jury would naturally and necessarily take [it] to be a comment on the failure" of Petitioner to testify.  *Lincoln*, 807 F.2d at 809.

**B. Harmless Error**

Even if a court were to find that the prosecutor commented indirectly on the petitioner's decision not to testify, reversal of a conviction is only required if: "(1) the commentary is extensive; (2) an inference of guilt from silence is stressed to the jury as a basis for the conviction; and (3) where there is evidence that could have supported acquittal." *Jeffries v. Blodgett*, 5 F.3d 1180, 1192 (9th Cir. 1993) (citing *Lincoln*, 807 F.2d at 809).

Here, any *Griffin* error was harmless. The prosecutor's statements were minimal and brief in the context of rebuttal closing arguments, consisting of less than a page in an argument that spanned twenty-eight pages. (ECF No. 7-25 at 40-68.) Furthermore, the comments at issue were separated by 23 pages of transcript. (ECF No. 7-10 at 27-29.) "It is not reasonably likely that the jury construed these widely separated comments regarding the main prosecution witnesses and [Petitioner] as a reflection on [Petitioner's] silence." (*Id.*)

The prosecutor did not stress to the jury that they should find Petitioner guilty of the charges because he did not testify. Rather, as discussed above, the comments were made: (1) to point to the absence of an innocent explanation for Petitioner's actions against Williams and his threats against Trice; and (2) in an attempt to appropriately rehabilitate the witnesses' credibility. Moreover, the trial court expressly instructed the jury that:

> A defendant has an absolute constitutional right not to testify. He or she may rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt. Do not consider, for any reason at all, the fact that the defendant did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way.

(ECF No. 7-10 at 28-29.) The jury is presumed to have followed these instructions, and Petitioner points to no basis in the record for finding that it did not. *See Fields v. Brown*, 503 F.3d 755, 782 (9th Cir. 2007) (*citing* Kansas v. March, 548 U.S. 163, 179 (2006)).

Finally, on habeas review, Petitioner must establish that any *Griffin* error had a "substantial and injurious effect on the verdict." *Beardslee v. Woodford*, 358 F.3d 560,

588 (9th Cir. 2004) (citing *Brecht*, 507 U.S. at 637). The evidence presented at trial against Petitioner was substantial. As accurately summarized in Respondent's Answer:

> Both Williams and Thomas testified that [Petitioner] was the shooter, witnesses at the scene reported hearing someone say, "We'll get you, Mike" and described a truck matching the description of the one owned by [Petitioner] as the vehicle from which the fatal shot was fired. [Petitioner] had threatened Wilson before the assault on July 10, 2005, and [Petitioner] had been seen driving around Wilson's neighborhood flashing gang signs and claiming his membership in the rival Skyline gang. The prosecution's expert testified that Skyline gang members were rivals with both the Lincoln and the Emerald Hills gangs. Hogan's murder occurred in Emerald Hills territory and the assault against Wilson occurred in Lincoln territory. [Furthermore, Petitioner's] own statements betrayed his anxiety at the prospect that Williams may have implicated him in the Hogan murder.

(ECF No. 32 at 20.)

Given the high standard on federal habeas review, the trial court's instructions to the jury, and the strong evidence of Petitioner's guilt, it is not conceivable to this Court that the jury would have come to a different conclusion had the prosecutor not made the comments Petitioner complains of.

For all the foregoing reasons, Petitioner has not established the state court's denial of this claim was contrary to, or an unreasonable application of, clearly established Supreme Court law. *Early*, 537 U.S. at 8 (2002). Accordingly, Petitioner is not entitled to relief on this claim.

## VI. CONCLUSION AND RECOMMENDATION

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) directing that judgment be entered denying the Petition.

**IT IS ORDERED** that no later than **August 13, 2015**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

//

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **August 27, 2015**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated: July 30, 2015

*[signature]*
Hon. Jill L. Burkhardt
United States Magistrate Judge